**In re SEALED CASE 96–3167.**

**No. 96–3167.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 10, 1997.

Decided Sept. 4, 1998.

Santha Sonenberg, Assistant Federal Public Defender, argued the cause for appellant, with whom A.J. Kramer, Federal Public Defender, was on the briefs.

Mary T. O'Connor, Assistant U.S. Attorney, argued the cause for appellee. Mary Lou Leary, U.S. Attorney, John R. Fisher, Steven J. McCool, Steven D. Mellin, and Elizabeth H. Danello, Assistant U.S. Attorneys, were on the brief.

Before: SILBERMAN, RANDOLPH and GARLAND, Circuit Judges.

GARLAND, Circuit Judge:

The defendant in this case was charged with six related offenses, including unlawful possession with intent to distribute cocaine base, and using or carrying a firearm during and in relation to a drug-trafficking offense. After losing a motion to suppress evidence seized from his house, the defendant entered a conditional plea of guilty to the cocaine and firearm charges. Based on the defendant's substantial assistance to law enforcement, the government filed a motion for a downward sentencing departure, below the otherwise applicable statutory mandatory minimums and sentencing guidelines ranges. The district court granted the motion and sentenced the defendant to two concurrent five-year terms of probation.

On appeal, the defendant contends the evidence obtained from his house should have been suppressed because it resulted from a warrantless entry that was not justified by either the "hot pursuit" or "exigent circumstances" exception to the warrant requirement, and because the subsequent search of two bedrooms was not justified as either a "search incident to arrest" or a "protective sweep" of the premises. The defendant further contends that the district court should have vacated his conviction on the firearm charge because of the Supreme Court's intervening decision in *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), which held that only firearms that are "actively employed" satisfy the "using" prong of the "using or carrying" a firearm offense.

We reject both contentions and affirm the defendant's convictions.

## I

In the early evening of February 22, 1994, Metropolitan Police Department officers William Riddle and David Wilber were driving in an unmarked police car through a residential neighborhood in northeast Washington, D.C. Although it was dark outside, the street was well-lit with high-intensity streetlights. The officers observed the defendant running or "walking quickly" down the street. Appellant's Appendix ("App.") at 47. Neither knew the defendant, and neither knew where he lived. They also did not know whether he was armed.

Proceeding in their car, the two officers followed the defendant until he came to a house. Neither officer knew who lived in the house. They watched as the defendant ran up a path leading to the front door, opened the outer screen door, and "struck the wooden door ... with his shoulder in such a force that ... it appeared ... he was forcing the door open." *Id.* at 41. The officers stopped their car and approached the house to investigate. Officer Riddle went to the front, while Officer Wilber went to the back.

Riddle saw that the front door was damaged and that there was "a break in the door around the lock area, which further led [him] to believe that the house was being burglarized." *Id.* at 42. In fact, "the wood around that lock [was] broke[n] completely off the door." *Id.* at 46. He also noticed there were no lights on in the downstairs area of the house, despite the fact that the defendant had just entered and it was dark inside. Riddle loudly and repeatedly announced that he was a police officer, but received no response. After again announcing his presence, Riddle tried to push on the front door. Someone immediately pushed back from the other side without saying anything. This pushing back and forth lasted approximately five to ten seconds, after which the pushing on the other side stopped and Riddle could hear footsteps away from the door. Based on what he had seen, Officer Riddle "believed that someone was burglarizing the house with the intent to either steal an item or injure someone within the house." *Id.* at 43.

After again identifying himself as a police officer, Riddle entered the house. Inside, Riddle saw the defendant running up a flight of steps. The officer chased the defendant up the stairs and into a large, darkened bedroom. Once there, Officer Riddle saw the defendant "standing sideways" to the door, and facing "an extremely dark corner of the bedroom." *Id.* at 49. Repeatedly calling out his identity as a police officer but receiving no answer, Officer Riddle pointed his weapon at the defendant and instructed him to show his hands. Before ultimately complying, the defendant's "hands came away from his body around his waist area, went into a dark corner of the bedroom, then

came back toward the middle of his body, and at that point he showed [Riddle] his hands." *Id.* at 49–50. Amidst his shouted instructions, Riddle did not hear anything hit the floor.

Officer Riddle then led the defendant into the hallway, patted him down for weapons, took him downstairs to the first floor, and handed him off to other officers who had just arrived. The defendant was not handcuffed. Riddle immediately returned upstairs to the large bedroom. Unable to turn the light on, Riddle used his flashlight. In the darkened corner, "where [defendant] was standing next to, and then his arms and hands had went into," Riddle discovered "laying in a chair, a plastic bag, which appeared to have busted open, or come open in some manner, and several large white rocks," *id.* at 51, later identified as crack cocaine. On the floor beside the chair was a semiautomatic handgun. The gun was lying "on top of a pair of shoes, and I believe a handbag, or some type of soft object." *Id.* at 63.

Upon finding this evidence, Riddle went directly back downstairs and handcuffed the defendant. Thereafter, Riddle and other officers "made a cursory exam of the house . . . to look for any other subjects that might have been in the house, as in somebody that lived there, or a small child that might have been scared by all the ruckus, in a closet or hiding, for any other victims that might have been in the house." *Id.* at 55–56. As he entered the small bedroom on the second floor, adjacent to the room in which he had apprehended defendant, Riddle saw a clear plastic bag containing white rocks sitting on a television stand. On the same stand was a triple-beam scale. Like the others, these white rocks were later identified as crack cocaine, and Riddle testified that the scale was of a kind "commonly used by narcotics distributors for the purpose of the weighing in and out of narcotics." *Id.* at 56–57. The officers also recovered from the defendant's person a pager, which later investigation dis-

closed had received over 800 calls that month.

After completing the search, and while filling out arrest paperwork, Riddle asked the defendant his address. The defendant gave an address different than that of the house in which he was arrested. The police did not learn until later that the defendant actually lived in that house.

The defendant moved to suppress the evidence seized from his house. The district court first found that the police had probable cause to arrest the defendant for burglary, based on the fact that the defendant appeared to have broken open the door, that the defendant had not responded when Officer Riddle announced he was a police officer, and that he had pushed back on the door when Riddle attempted to enter. *Id.* at 179. The court also concluded that the warrantless entry into the defendant's house was justified under the "hot pursuit" exception to the warrant requirement suggested by the Supreme Court in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Accordingly, the district court found it was "unnecessary" to consider "whether warrantless entry also was justified under exigent circumstances," pursuant to *Dorman v. United States,* 435 F.2d 385 (D.C.Cir.1970). *See* App. at 180–81.

The district court further held that Riddle "had a reasonable basis for pursuing the defendant up the stairs and into the large bedroom," and that the items recovered from that large bedroom were lawfully "seized incident to the arrest." *Id.* at 180. Finally, the court held that the items found in the other bedroom were in plain view and seized as a part of a valid "protect[ive] sweep" under *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Accordingly, the district court denied the defendant's motion to suppress.[1]

---

1. The defendant also moved to suppress a post-arrest statement to the police, in which he admitted throwing down the drugs and the gun, both of which he had obtained from a crack dealer for whom he sold on the street. App. at 80, 84–85. Because the officer who advised the defendant of his rights at the time of his arrest could not remember how the defendant responded to her

warnings, the government advised the court that it would not use the defendant's statement in its case-in-chief. *Id.* at 138. The court therefore denied the motion to suppress the statement as moot, and did not rely on it in deciding the defendant's various other motions. *Id.* at 139, 178.

After the denial of his motion to suppress, the defendant entered a conditional plea of guilty to the cocaine and firearm charge. Following the Supreme Court's decision in *Bailey,* and before his sentencing, the defendant moved to vacate his conviction on the firearm charge. The district court denied the motion, holding that the defendant had admitted that he used "and carried" the firearm, and that this was sufficient because *Bailey* had not changed the law relating to the "carried" prong of that offense.

## II

In order to determine whether the evidence in this case was lawfully seized, we must first consider whether the warrantless entry and arrest in the defendant's home were valid, and then consider whether the subsequent warrantless searches were proper. We consider the former issue in this Part, and the latter in Part III below.

■ "It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (internal quotation and citation omitted). For that reason, "a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show ... the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Likewise, "warrantless felony arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances." *Welsh,* 466 U.S. at 749, 104 S.Ct. 2091; *see also Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

■ Here, the police did not have a warrant. Thus, for the entry of the defendant's house to be held lawful, the government must meet two distinct burdens: it must demonstrate that the police had probable cause to believe a crime was being committed, and that there were exigent circumstances justifying the police's failure to procure a warrant. *See United States v. Dawkins,* 17 F.3d 399, 403 (D.C.Cir.1994). We consider first

whether there was probable cause, and then whether there were exigent circumstances. We review de novo the district court's conclusion that there was probable cause, *see Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Streater,* 70 F.3d 1314, 1316 (D.C.Cir.1995), as well as its conclusion that the warrantless entry and arrest were justified by an exception to the Fourth Amendment's warrant requirement, *see Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657; *United States v. Timberlake,* 896 F.2d 592, 595 (D.C.Cir.1990); *United States v. Socey,* 846 F.2d 1439, 1445 (D.C.Cir.1988).[2] The district court's underlying factual findings are reviewed solely for clear error. *See Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657; *United States v. Patrick,* 959 F.2d 991, 996 n. 6 (D.C.Cir.1992).

## A

■ We conclude, as did the district court, that Officers Riddle and Wilber had probable cause to believe the defendant was committing a burglary. The police observed someone appear to break open the door to an unlit house and enter it without turning on the lights. When the police approached the door to investigate, they discovered that the lock was indeed broken. When Riddle identified himself as a police officer, the person who had entered the house did not respond in any way. And, when Riddle again identified himself as a police officer and tested the door, the person inside pushed back for several seconds. The officer then heard steps going away from the door. The totality of these circumstances gave the officer probable cause to believe a burglary was in progress.

■ A forced door or window is a commonly recognized element of probable cause in a burglary case. *See, e.g., United States v. (Emil) Johnson,* 9 F.3d 506, 507 (6th Cir. 1993) (broken window); *United States v. Valles–Valencia,* 811 F.2d 1232, 1235–36 (9th Cir.1987) (pried-open window); *United States v. Dart,* 747 F.2d 263, 265 (4th Cir. 1984) (sawed-off lock and forced-open doors); *United States v. Estese,* 479 F.2d 1273 (6th

---

2. The same standard applies to our review in Part III of the district court's conclusion that the

warrantless searches were justified by exceptions to the warrant requirement.

Cir.1973) (pried-open door); *see also United States v. Tibolt,* 72 F.3d 965, 970 (1st Cir. 1995) (unlocked rear door). The same is true of the absence of lights, *see Reardon v. Wroan,* 811 F.2d 1025, 1026 (7th Cir.1987), and of silence in response to an officer's calls, *see Tibolt,* 72 F.3d at 967; *Murdock v. Stout,* 54 F.3d 1437, 1442 (9th Cir.1995); *(Emil) Johnson,* 9 F.3d at 509. The defendant's apparent flight away from the door also added to the probable cause. *See Kolender v. Lawson,* 461 U.S. 352, 366 n. 4, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (Brennan, J., concurring) (noting that individual's flight in reaction to investigatory stop by officer may "provide the necessary information, in addition to that the officers already possess, to constitute probable cause"); *United States v. Green,* 670 F.2d 1148, 1151 (D.C.Cir.1981). Although these elements already provided sufficient probable cause to believe a burglary was in progress, they certainly justified the officer's next step of testing the door. When the defendant pushed back without any explanation, without requesting identification from the officer, and without identifying himself as the homeowner, Officer Riddle acquired further grounds to believe he had discovered a burglary.

■ In rebuttal, the defendant argues that many of the above-cited precedents can be distinguished because they involved police investigating neighbors' reports of suspected burglaries. But the fact that probable cause can be supplied by third party reports of suspicious activity, does not mean the police cannot act when they observe the suspicious activity themselves. Quite the opposite is true.

The defendant also challenges the conclusion of probable cause by focusing on its individual elements. He warns that approving the search in this case would give the police carte blanche to arrest any law-abiding citizen with the misfortune to have a "sticky" door that requires an extra shove to open. But probable cause here, as in every case, depends upon the totality of the circumstances. *See Dawkins,* 17 F.3d at 403. The police did not rely on their observation of the "shove" alone. They relied on the shove, the broken door, the absence of light, the defendant's failure to respond to their repeated inquiries, the push-back on the door, and the

defendant's apparent flight away from it. This confluence of events is unlikely to occur in the usual case of a homeowner's "sticky door."

■ Finally, it is irrelevant to the probable cause inquiry that the officers later learned the defendant had entered his own house, and that he later offered evidence that the door had been broken for several years prior to this incident. The officers did not know these things at the time they entered the home; what matters is their reasonable belief that unlawful activity was in progress at the time of the entry and arrest. *See Tibolt,* 72 F.3d at 971; *Murdock,* 54 F.3d at 1444. Of course, had the defendant immediately identified himself as the owner of the house, the totality of the circumstances might have been quite different. But the fact that he failed to do so, when the officers could reasonably expect that the true homeowner would have, adds rather than detracts from the calculus of probable cause.

**B**

■ Probable cause alone does not justify the warrantless entry of a home. There must also be some exception to the warrant requirement. *See, e.g., Dawkins,* 17 F.3d at 403; *United States v. McCraw,* 920 F.2d 224, 228 (4th Cir.1990). The court below concluded that the entry was justified under the "hot pursuit" exception suggested in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). On appeal, the government does not press the "hot pursuit" exception, and instead argues that the "exigent circumstances" exception, recognized by this court in *Dorman v. United States,* 435 F.2d 385 (D.C.Cir.1970) (en banc), justifies the entry and arrest. *See also United States v. Mason,* 966 F.2d 1488, 1492 (D.C.Cir.1992). We agree and affirm the district court's judgment on that basis, without addressing the "hot pursuit" exception. *See United States v. Abdul–Saboor,* 85 F.3d 664, 666 (D.C.Cir. 1996).

■ "Hot pursuit" is, of course, just one form of "exigent circumstance." *See Hayden,* 387 U.S. at 298, 87 S.Ct. 1642 (holding that "under the circumstances of this case,

the exigencies of the situation made" entry without a warrant "imperative"); *Dorman,* 435 F.2d at 391. The Supreme Court also has recognized that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal citations and quotations omitted); *see Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (recognizing that warrantless entry may be justified by "the risk of danger to the police or to other persons inside or outside the dwelling"); *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (holding that a "burning building presents an exigency of sufficient proportions to render a warrantless entry 'reasonable' "); *see also Mason,* 966 F.2d at 1492–93; *Timberlake,* 896 F.2d at 596. The Court has also suggested that warrantless entries are permissible to prevent the destruction of evidence, *see Minnesota v. Olson,* 495 U.S. at 101, 110 S.Ct. 1684; *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *see also Dawkins,* 17 F.3d at 405; *Timberlake,* 896 F.2d at 596, or a suspect's escape, *see Olson,* 495 U.S. at 100, 110 S.Ct. 1684.

█ Although the Supreme Court has never provided a catalog of all such exigencies, *see Welsh,* 466 U.S. at 749, 104 S.Ct. 2091, this court has said that, at bottom, "[t]he test for exigent circumstances is whether police had an 'urgent need' or 'an immediate major crisis in the performance of duty afford[ing] neither time nor opportunity to apply to a magistrate.' " *United States v. (James) Johnson,* 802 F.2d 1459, 1461 (D.C.Cir.1986) (quoting *Dorman,* 435 F.2d at 391). Other circuits have taken the same view. *See, e.g., United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990) (en banc) ("The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action.") (citing *Dorman,* 435 F.2d at 391).

█ The government bears the "heavy burden" of proving such "urgent need." *See Welsh,* 466 U.S. at 749–50, 104 S.Ct. 2091; *Dorman,* 435 F.2d at 392. Like the determination of probable cause, the question of whether there were "exigent circumstances" is judged according to the totality of the circumstances. *See Socey,* 846 F.2d at 1446; *(James) Johnson,* 802 F.2d at 1462. And like the standard for probable cause, the standard for exigent circumstances is an objective one, focusing "on what a reasonable, experienced police officer would believe." *Timberlake,* 896 F.2d at 596; *Socey,* 846 F.2d at 1446–47.

█ The government's claim of exigency in this case rests on the officers' belief that the defendant was engaged in an ongoing burglary attempt that could have endangered the occupants of the house if the police had paused to obtain a warrant. At the time he pursued the defendant into the house, Officer Riddle "believed that someone was burglarizing the house with the intent to either steal an item or injure someone within the house." App. at 43. As we have held above, that belief was objectively reasonable. Numerous other circuits have found that probable cause to believe a burglary is in progress constitutes exigent circumstances sufficient to permit warrantless entry. *See, e.g., Tibolt,* 72 F.3d at 970; *Murdock,* 54 F.3d at 1442; *(Emil) Johnson,* 9 F.3d at 509–10; *Reardon,* 811 F.2d at 1025, 1029–30; *Dart,* 747 F.2d at 267; *United States v. Singer,* 687 F.2d 1135, 1144 (8th Cir.1982); *Estese,* 479 F.2d at 1274. We join those circuits today.

As we have said before, "[b]reaking a dwelling house ... creates a substantial risk of confrontation between the perpetrator and an occupant.... And where such a confrontation occurs, there is a substantial risk that serious injury ... will occur." *United States v. Jackson,* 113 F.3d 249, 253 (D.C.Cir.1997). For that reason, burglary of a house, with or without a weapon, is considered a "crime of violence" under provisions of the United States Code and the U.S. Sentencing Guidelines. *See* 18 U.S.C. § 924(e)(2)(B) (burglary punishable by imprisonment for more than one year constitutes "violent felony" for purposes of Armed Career Criminal Act); U.S.S.G. § 4B1.2(a) (crime punishable by imprisonment for more than one year, that is a "burglary of a dwelling ... or otherwise involves conduct that presents a serious po-

tential risk of physical injury to another," is a "crime of violence" for career offender Guideline). The need to prevent such a confrontation, by intercepting the burglar before he potentially confronts (or is confronted by) an occupant, is surely an exigent circumstance.

The defendant argues that the police had no evidence he was armed when he entered the house, and no evidence that there were any occupants inside for him to endanger. But since the police also had no evidence to the contrary, it was appropriate for them to act on the basis of the kinds of risks burglaries normally present. They did not have to wait until they heard shots fired or an occupant scream. By that time, the purpose of permitting immediate entry—preventing such shots and screams—would have been lost. "Speed here was essential," *Hayden,* 387 U.S. at 299, 87 S.Ct. 1642, and that is the essence of an exigent circumstance. As the Supreme Court recognized in *Hayden,* "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Id.* at 298–99, 87 S.Ct. 1642.

### III

We have concluded that the officers' entry to prevent what appeared to be a burglary in progress was lawful. For the same reason, the warrantless apprehension of the defendant for that suspected burglary was lawful. We next must consider the propriety of the subsequent search of the two bedrooms. The government does not allege that the exigent circumstances of the burglary alone validated the searches. Instead, it focuses on two more specific exceptions to the warrant requirement, a different one for each bedroom. We begin with the search of the large bedroom, which the district court upheld as a search incident to arrest, and proceed to that of the small bedroom, which the court upheld as a protective sweep.

### A

In *Chimel v. United States,* the Supreme Court held that, incident to a lawful arrest, the police may properly search the area within the arrestee's "immediate control." 394 U.S. 752, 763 (1960). A search of that area is permissible, regardless whether in the circumstances of a particular case it is probable that "weapons or evidence would in fact be found" there. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467 (1973); *see also United States v. Chadwick,* 433 U.S. 1, 14–15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Abdul–Saboor,* 85 F.3d at 667. In this case, it is clear that the guns and drugs Officer Riddle found in the large bedroom were located in an area under the defendant's "immediate control." The defendant was arrested while standing next to a chair in the bedroom. The drugs were found on that chair, and the gun was found beside it. App. 51–52.

The defendant contends that *Chimel* is inapplicable here. "Although the larger bedroom was the room in which [he] had been arrested," Defendant's Br. at 17,[3] the defendant emphasizes that he was at the bottom of the stairs by the time the bedroom was searched. By that time, the large bedroom was no longer under his "immediate control." The critical time for analysis, however, is the time of the arrest and not the time of the search.

In *New York v. Belton,* the Supreme Court held that when the police lawfully arrest the occupant of an automobile, they may "as a contemporaneous incident of that arrest, search the passenger compartment,"

---

**3.** In his brief, the defendant took the position that he "was arrested ... when he was stopped at gun-point by Riddle and transported downstairs to the custody of another officer. Thus ... even before any contraband had been found, [the defendant] was not free to leave." Defendant's Br. at 16. At oral argument, however, he suggested he might not actually have been arrested until the police discovered the gun and drugs, handcuffed him, and formally placed him under arrest on those charges, rather than on the burglary charges the police originally contemplated. That formal arrest did not occur until after the defendant was already at the bottom of the stairs. The defendant was correct the first time, however. He was arrested for Fourth Amendment purposes when Riddle apprehended him at gunpoint in the large bedroom. *See Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *United States v. Tavolacci,* 895 F.2d 1423, 1428 (D.C.Cir.1990).

even if the occupant has been removed and is no longer in the car at the time of the search. 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). We have since rejected the argument that *Belton* applies only to automobiles, and affirmed that the area under a defendant's "immediate control" for *Chimel* purposes must be examined as of the time the arrest occurs. *See United States v. Brown*, 671 F.2d 585, 587 (D.C.Cir.1982). In *Brown*, we validated the search of a pouch taken from a defendant at the time of arrest, even though the search took place after the pouch was moved out of the reach of defendant's control. As long as a search is "contemporaneous with" and an "integral part of" a lawful arrest, we held, the police may search a container that was within reach "when the arrest occurs, even if the officer has since seized it and gained exclusive control over it." *Id.* at 587; *see United States v. Tavolacci*, 895 F.2d 1423, 1429 (D.C.Cir.1990) (citing *Brown*).

Our recent decision in *United States v. Abdul–Saboor* makes the same point, and is on all fours with the case at bar. There, deputy United States marshals took the defendant into custody in a bedroom, removed him from the room, handcuffed him, and seated him in a chair approximately "four feet outside the bedroom doorway." 85 F.3d at 666. A marshal then returned to the bedroom and seized two weapons. After leaving the bedroom to make necessary arrangements, the marshal again returned to search the bedroom, this time finding drugs and additional guns. We upheld both searches as incident to the arrest.

Reviewing the history of *Belton* and *Brown*, we concluded that the "determination of immediate control must be made when the arrest occurs." *Id.* at 668. In so holding, we noted that our view was in accord with that of our sister circuits.[4] Indeed, we noted that making the test turn exclusively on the time of the search "might create a perverse incen-

tive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer." *Id.* at 669. We emphasized, however, that a search is incident to arrest only so long as it is an "integral part" of the arrest process. The relevant distinction turns upon "whether the arrest and search are so separated in time or by intervening events that the latter cannot fairly be said to have been incident to the former." *Id.* at 668. Such a temporal separation did not occur in this case: Officer Riddle searched the large bedroom immediately after arresting and removing the defendant.

Notwithstanding our holding in *Abdul–Saboor*, the defendant contends that the search here was invalid under our opinion in *United States v. Lyons*, 706 F.2d 321 (D.C.Cir.1983). In *Lyons*, we held that the search of a closet in the hotel room where the defendant had been arrested, which took place after the defendant had been handcuffed and seated in a chair near the doorway to the room, was not a valid search incident to arrest because it was "inconceivable that [the defendant] could have gained access" to the closet. 706 F.2d at 330–31. We agree that there is some tension between *Lyons*, which seems to focus on whether the space searched was accessible at the time of the search, and our earlier decision in *Brown* and later decision in *Abdul–Saboor*, both of which focused on the time of the arrest. We need not resolve that tension, however, to decide this case.

In *Abdul–Saboor*, we distinguished *Lyons* as a case that added an extra requirement to the "search incident to arrest" exception. Not only must the area searched be under the defendant's "immediate control" at the time of the arrest, it must also be "conceivably accessible" to the defendant at the time of the search. *Abdul–Saboor*, 85 F.3d at 669–70. Whether or not this added require-

---

4. *See Abdul–Saboor*, 85 F.3d at 670, citing, inter alia: *Davis v. Robbs*, 794 F.2d 1129, 1130–31 (6th Cir.1986) (arrestee handcuffed and placed in squad car prior to seizure of rifle in house); *United States v. Cotton*, 751 F.2d 1146, 1147–48 (10th Cir.1985) (arrestees handcuffed and apparently guarded by officer while trooper searched vehicle); *United States v. Silva*, 745 F.2d 840, 847 (4th Cir.1984) (arrestees handcuffed and guarded by agents prior to search of room); *United States v. Palumbo*, 735 F.2d 1095, 1096–97 (8th Cir.1984) (arrestee surrounded by several officers and possibly handcuffed prior to search). *See also United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir.1996) (defendant handcuffed and removed from house); *United States v. Mitchell*, 64 F.3d 1105, 1110 (7th Cir.1995) (defendant handcuffed during search of briefcase).

ment is consistent with the reasoning of *Belton*, *Brown* and *Abdul–Saboor*, it is satisfied in this case. As we said in *Abdul–Saboor*, "showing that the area searched was 'conceivably accessible at the time of the search' was not meant to be difficult." *Id.* at 669. It was not satisfied in *Lyons*, we said, because the defendant there had briefly collapsed after his arrest and then been revived and "immobilized," handcuffed in a chair, and surrounded by six officers. Under those circumstances, it was not "conceivable" that the defendant could have struggled free and lunged into the closet—which was "several yards away" and to which he had never previously sought access. *Abdul–Saboor*, 85 F.3d at 669.

In *Abdul–Saboor*, by contrast we found the "conceivably accessible" test satisfied. Although like Lyons, Abdul–Saboor had been handcuffed, he had not otherwise been "immobilized" or "physically restrained." In addition, he "did not suffer any infirmity that would impede his physical ability," compared to Lyons who had collapsed after his arrest. Moreover, unlike Lyons, Abdul–Saboor "had specifically requested entry to the area searched"—he had asked the marshal to let him enter the bedroom to dress before being taken away. And also unlike Lyons, Abdul–Saboor had "demonstrated both the capacity and the desire to avoid arrest"—upon entering the bedroom, he had tried to pick up and hide a handgun. Finally, the hotel room in which Lyons was arrested had been rented by the police, while the room in which Abdul–Saboor was arrested was unfamiliar to the officers and contained a weapon known to defendant. On the basis of these circumstances, we concluded that, unlike Lyons, it was "conceivable" that Abdul–Saboor might attempt to run back into the bedroom after his removal, even though such an attempt might not be "rational" or likely to succeed. 85 F.3d at 670.

The case at bar satisfies the "conceivably accessible" test even more readily than did *Abdul–Saboor*. Here, the defendant was not handcuffed or otherwise immobilized at the time of the search of the large bedroom. He did not suffer any physical infirmity; to the contrary, the officers had just watched him move through the neighborhood at a rapid pace. Like Abdul–Saboor, the defendant here both had specifically sought access to the room being searched and had demonstrated the capacity and desire to avoid arrest: he had fled from Officer Riddle into the very bedroom at issue. And also like Abdul–Saboor, the defendant here had a motive for going back to the room—he knew there was a weapon there. Finally, although the defendant was at the bottom of the stairs at the time of the search, only minutes before he had raced up those very stairs in an effort to evade Riddle. Under these circumstances, the bedroom here was no less "conceivably accessible" to the defendant than was the bedroom in *Abdul–Saboor*.

**B**

We now proceed to the search of the small bedroom, which the district court justified not as a search incident to arrest under *Chimel*, but as a lawful "protective sweep" under *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). *See* App. at 180. We agree with the district court's conclusion and affirm. We note, moreover, that this rationale provides a second lawful justification for the search of the large bedroom considered above.

In *Buie*, the Supreme Court held that, incident to an arrest, the police may conduct a "protective sweep, that is, a quick and limited search of premises . . . to protect the safety of officers or others." 494 U.S. at 327, 110 S.Ct. 1093. Such a search must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." When limited to looking "in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched," it may be undertaken "as a precautionary matter and without probable cause or reasonable suspicion." *Id.* at 334, 110 S.Ct. 1093. A sweep of more remote areas may also be permitted, but for that "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Because the government does not contend that the search of the small bedroom was supported

by articulable suspicion, Gov't Br. at 27–28 n.6, we consider only the first kind of *Buie* sweep.

 As with a search incident to arrest, we analyze a protective sweep from the vantage point of the time of the arrest and ask whether the place searched was one "immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093; *see also Abdul–Saboor,* 85 F.3d at 669. The district court found that the small bedroom "was only a few feet from the larger bedroom door and only a few feet from the top of the stairs," and "was a space from which an attack could be immediately launched." App. at 338. We see no reason to disturb that finding. *See United States v. Lauter,* 57 F.3d 212, 213, 216–17 (2d Cir. 1995) (approving protective sweep of second room "immediately adjoining" room in which defendant had been arrested).

The defendant argues that our decision in *United States v. Ford,* 56 F.3d 265 (D.C.Cir. 1995), demonstrates that *Buie*'s first prong does not extend to the small bedroom at issue here. To the contrary, *Ford* supports application of *Buie* to this case. In *Ford,* we upheld, under *Buie*'s first prong, a protective sweep of a bedroom adjoining a hallway in which the defendant was arrested. We also upheld the seizure of a gun clip found in plain view in that bedroom. *See* 56 F.3d at 270. What we declined to validate in *Ford* were seizures of additional items found under a mattress and behind window shades, "because these were not spaces from which an attack could be immediately launched." *Id.* at 266. Those kinds of seizures are not at issue here. In this case, Officer Riddle discovered the drugs and triple-beam scale during a "cursory visual inspection" of the small bedroom, *see Buie,* 494 U.S. at 334, 110 S.Ct. 1093. Indeed, he discovered them immediately upon entering the room, in what the district court found to be "plain view." App.

at 180. Accordingly, the search of the small bedroom was lawful under the first prong of *Buie.*[5]

Finally, we should note that in this case, the search of the small bedroom might be justified by a second rationale: not only to protect the officers, but also to protect the home's residents. As the officers saw the situation, the defendant was a burglar who had just charged up the stairs and into the bedroom of someone else's house. In those circumstances, a sweep to discover a hidden accomplice might be justified to protect unsuspecting residents who return after the police depart. It might also be justified to determine whether the residents or their children were currently hiding—either injured or cowering in fear. *See* App. at 55–56 ("We made a cursory exam of the house ... to look for any subjects that might have been in the house, as in somebody that lived there, or a small child that might have been scared by all the ruckus, in a closet or hiding, for any other victims that might have been in the house."); *cf. Mincey,* 437 U.S. at 392, 98 S.Ct. 2408 ("[W]hen the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises."). We need not determine whether the scope of a search supported by such a rationale would be any broader than that approved in *Buie,* as the first prong of *Buie* validates the search the officers conducted here.

## IV

The defendant's final contention is that the district court should have vacated his conviction to the charge of violating 18 U.S.C. § 924(c)(1), which applies to anyone who, during and in relation to a drug trafficking crime, "uses or carries" a firearm. In *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), decided after the

---

5. In *Ford,* we distinguished *Buie* itself as a case where "the defendant ... was arrested outside the basement and the search was conducted in the basement, which presumably contained spaces which were not immediately adjoining the place of Buie's arrest." 56 F.3d at 269 n. 3. For that reason, the *Buie* basement had to be evaluated under *Buie*'s second prong, which requires

"articulable suspicion." Unlike the *Buie* basement, however, neither the *Ford* bedroom nor the bedroom here were large enough to "contain spaces which were not immediately adjoining the place of" arrest. Moreover, the evidence in this case was seized from a television stand that was visible the moment Officer Riddle entered the bedroom.

defendant entered his plea but before he was sentenced, the Supreme Court held that to establish "use" under § 924(c)(1), the government must show "active employment of the firearm." *Id.* at 144, 116 S.Ct. 501. After *Bailey*, "[a] defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs." *Id.* at 149, 116 S.Ct. 501. Both parties agree that there was no evidence of "active employment" of a weapon in this case, and hence that the defendant's conviction cannot be sustained on the "use" prong of § 924(c)(1).

■ But § 924(c)(1) bars not only using, but also carrying a firearm during and in relation to a drug trafficking crime.[6] And while *Bailey* interpreted the "use" prong narrowly, it recognized that evidence that fails to show "use" may nonetheless support a conviction for "carrying." *See* 516 U.S. at 146, 116 S.Ct. 1035; *see also United States v. Cruz–Rojas*, 101 F.3d 283, 284 (2d Cir.1996). Indeed, last Term the Court interpreted the "carry" prong broadly, relying on it to uphold a guilty plea that could not satisfy the "use" prong. *See Muscarello v. United States*, — U.S. —, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998).

In *Muscarello*, the Fifth Circuit considered a defendant's pre-*Bailey* plea to "using and carrying," which had been based on the fact that the gun in question was found inside the locked glove compartment of the car Muscarello had been driving. Although the government conceded that after *Bailey* these facts could no longer support a conviction for "use," the Fifth Circuit sustained the plea on the alternative basis of "carrying." *See United States v. Muscarello*, 106 F.3d 636, 638 (5th Cir.1997). The Supreme Court affirmed. The Court held that Congress intended "carry" to convey its ordinary meaning, which it said includes both carrying a weapon directly on the person, and carrying one in a car. *See Muscarello*, — U.S. at — — —, 118 S.Ct. at 1916–19.

■ In this case, as in *Muscarello*, the defendant pled guilty to using *and* carrying the weapon. That plea was contained in a written plea agreement, *see* Plea Letter at ¶ 1, repeated at the plea proceeding,[7] and confirmed by the district court upon its review of the record after the defendant filed his motion, *see* App. at 329.

■ The defendant's plea alone does not, of course, end the matter. Federal Rule of Criminal Procedure 11(f) provides that "notwithstanding" a plea, "the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." Fed. R.Crim.P. 11(f); *see also Cruz–Rojas*, 101 F.3d at 285. To demonstrate a satisfactory factual basis, the government must have "evidence from which a reasonable juror could conclude that the defendant was guilty as charged." *United States v. Ford*, 993 F.2d 249, 253 (D.C.Cir.1993). As long as there is a satisfactory factual basis to support a "carrying" charge, however, the defendant's conviction may be sustained even though it would fail on the "use" prong alone. *See Muscarello*, — U.S. at —, 118 S.Ct. at 1914; *United States v. Harlan*, 130 F.3d 1152, 1153 (5th Cir.1997); *United States v. Mitchell*, 104 F.3d 649, 652–53 (4th Cir.1997).

■ The defendant's unadorned admission of guilt—while it may add evidentiary support—is not alone sufficient to provide a factual basis for the plea. *See Stanback v. United States*, 113 F.3d 651, 657 (7th Cir. 1997) ("holding that merely conced[ing] culpability in the language that the statute uses without acknowledging any concrete facts that fall within the meaning of carrying" is insufficient to sustain plea); *Cruz–Rojas*, 101 F.3d·at 286. We also agree with the defendant that the government's statement in its proffer to the district court, that it would be able to prove defendant "did indeed *possess* the .45 caliber handgun," App. at 245–46

---

**6.** The defendant does not contend there was any infirmity in the proof of the "during and in relation to" element of the offense.

**7.** The district court advised the defendant that he would be pleading guilty to the following charge: "that you did unlawfully and knowingly use *and* carry a firearm, that is, a Haskel .45 pistol, during and in relation to the offense of unlawful

possession with intent to distribute cocaine base, a drug trafficking crime." App. at 238 (emphasis added). The court further explained: "So that's what you'd actually be pleading guilty to, ... that you used *and* carried this .45 caliber Haskel pistol." *Id.* (emphasis added). The court then asked, "Do you understand that's what the charges are?" Defendant replied: "Yes. Yes, sir." *Id.*

(emphasis added), is insufficient to establish "use" after *Bailey*. *See, e.g., Lee v. United States*, 113 F.3d 73, 76 (7th Cir.1997); *United States v. Smart*, 98 F.3d 1379, 1393 (D.C.Cir. 1996). Moreover, because "possess" may encompass various attenuated forms of constructive possession, it is also insufficient to satisfy the "carry" prong of § 924(c). *See United States v. Sheppard*, 149 F.3d 458 (6th Cir.1998). *See generally Young v. United States*, 124 F.3d 794, 801 (7th Cir.1997).

But the defendant's admission and the statement regarding possession were not the only evidence the government offered. The proffer also recited the facts of the defendant's arrest: specifically, that when directed to show his hands, the defendant instead moved his hands away from his body and toward the corner, before finally drawing them back to show to the officer. Moments later, Officer Riddle found the gun and drugs in the place toward which the defendant had gestured. The government argues that this evidence supports an "inference that [the defendant] tossed away the gun and drugs when cornered by the officer," and had "carried" them up until that point—an inference that would satisfy the definition of "carry" announced in *Muscarello*. Gov't Br. at 33. We agree. *See Young*, 124 F.3d at 801 (stating that district court may rely on inferences in finding factual basis under Rule 11(f)); *United States v. Graves*, 106 F.3d 342, 345 (10th Cir.1997) (same); *cf. United States v. Dunn*, 846 F.2d 761, 764 (D.C.Cir.1988) (holding that a reasonable jury could find defendant possessed gun and drugs where officer saw defendant make "pitching motion" toward couch and then found gun on couch and drugs behind it).

In response to the government, it might be argued that, although it is possible the defendant tossed the gun toward the chair, it is equally possible that the gun was lying there when he entered the bedroom. Had the gun been found somewhere else in the room, this argument might be persuasive. But instead, the gun was found in the precise spot toward which the defendant gestured when he was initially apprehended. Moreover, since the gun was found lying atop a soft object, the fact that the officer did not hear it fall does not weaken the inference that the defendant tossed it there. To the contrary, it is perfectly consistent with that inference.

We do not dispute that this is a close case. But we conclude that a reasonable juror could have found that the defendant carried the gun up the stairs and then tossed it toward the chair when the officer ordered him to show his hands. And those facts are sufficient, under *Muscarello*, to sustain a plea to carrying a firearm in violation of 18 U.S.C. § 924(c).

For the foregoing reasons, the defendant's convictions are affirmed.