*494 CRAWFORD, Chief Judge
(dissenting):
The majority ignores * the “touchstone of the Fourth Amendment” — the reasonableness of police action at the scene of the crime. See, e.g., Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The majority also gives short shrift to several salient facts, including: Appellant lied to the police regarding what transpired in his apartment, and then became very agitated as the police were trying to control the crime scene, aid the victim, ensure their own safety, and gather evidence. The actions of the responding police officer and his back-up under these circumstances were more than reasonable.
The Fourth Amendment has two clauses: reasonableness and probable cause. Most importantly, the Fourth Amendment requires all government searches and seizures to be reasonable. The search in this case satisfied that requirement and is not precluded by Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), or Flippo v. West Virginia, 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999). In addition to the search being reasonable, it also may be justified as incident to the lawful arrest of Appellant. Accordingly, I respectfully dissent from the lead opinion.
FACTS
It is important to highlight additional facts of this ease to understand the reasonableness of the police officer’s action.
On August 29, 1999, at 6:25 p.m., a Kileen, Texas, Police Officer, Eric Fox, arrived at Appellant’s apartment in response to a report of a fight. When Officer Fox arrived, he approached Specialist (SPC) Dewit, who said that he had accompanied PFC W, the assault victim, to the apartment to remove PFC W’s personal belongings. Officer Fox then approached the apartment and talked to Appellant. Appellant said there had been a fight, but that the friend with whom he fought had departed. SPC Dewit, by contrast, told the officer no one had left the scene.
Officer Fox then asked to enter the apartment. Appellant was initially reluctant, but eventually allowed him to enter the apartment to see if anyone was injured after the fight. Officer Fox made a visual sweep of the apartment and found PFC W unconscious lying in a pool of blood on the floor in the guest bedroom next to the bathroom door. At first, Appellant complied with Officer Fox’s order to stay on his knees, but then became agitated and stood up. Officer Fox asked what had happened. Officer Fox stated that Appellant “proclaimed that [PFC W] had barged in and he had to kick his ass.” Appellant then “got up off the ground ... then again ordered him to the ground, and there was a small scuffle. [Officer Fox] did have to place him in [hand]cuffs.” Appellant continued to insist that PFC W had barged in, but Officer Fox challenged this assertion by noting that there was no damage to the front door. A very agitated Appellant still insisted that PFC W had barged in. Officer Fox again ordered him to the floor. “Due to his size and me still trying to watch the victim, [Officer Fox] pull[ed] out [his] pepper spray and advised that [he] would have to spray him. He did calm down again, but then escalated his behavior again.” Appellant was ordered to his knees a number of times, causing Officer Fox to pull out the pepper spray. Because of Appellant’s reactions, Officer Fox quickly ordered back-up and an ambulance, and handcuffed Appellant.
Within five minutes of the backup request, additional officers arrived, took control of Appellant, and secured the apartment. Within 15 or 20 minutes after the officers had secured the crime scene and left, Investigator Patrick Boone arrived. Even though the other officers had left and Investigator Boone had arrived, the police did not know who else might be involved and Appellant was not cooperative. Accordingly, Investigator Boone conducted a search of the bedroom and bathroom for a weapon. While looking for weapons, he opened the medicine cabinet, which is about three feet from where the *495 victim had been before he was moved, and noticed a manila folder with writing on the outside, admitted at trial as Prosecution Exhibit 6. Investigator Boone described the folder as being “immediately visible” and “in plain view.” “Without removing the [folder] from the cabinet, Investigator Boone began reading the front side; the handwriting appeared similar to other visible items in the apartment bearing the accused’s name.” Investigator Boone, who had prior military service, thought it “strange that a private would be sharing an apartment with an officer.” After reading the note, “[Investigator] Boone concluded the letter provided a motive for the accused to assault [PFC W] and seized it as evidence.” Investigator Boone stayed at the crime scene for approximately an hour and a half, to take crime scene photographs, including photographs of the blood splatters and blood swipes.
The next morning, Investigator Boone interrogated Appellant, who described the circumstances surrounding the fight. Appellant, a platoon leader, denied anything more than a platonic friendship with PFC W. Investigator Boone then asked him about the handwritten note, and Appellant admitted to a sexual relationship with PFC W. After the judge denied the motion to suppress the note, Appellant entered a guilty plea to fraternization by exceptions and substitution in the lesser included offense of assault by inflicting grievous bodily harm.
In denying the motion to suppress, the judge said: “Under the circumstances of this case, I find the accused forfeited any reasonable expectation of privacy he may have had in the letter when he surrendered it to [PFC W]____” The judge held that the seizure of the letter “from the medicine cabinet was incident to the accused’s lawful arrest.” The search was “substantially contemporaneous with the accused’s arrest and especially limited to the area within the accused’s immediate control.”
DISCUSSION
The Bill of Rights grants American citizens extensive rights. Courts and commentators have long debated the application of these rights to servicemembers. See, e.g., United States v. Lopez, 35 M.J. 35, 41 n. 2 (C.M.A.1992); Fredric I. Lederer & Frederic L. Borch, Does the Fourth Amendment Apply to the Armed Forces?, 3 Wm. & Mary Bill Rts J. 219 (1994), reprinted and expanded in 144 Mil. L.Rev. 110 (1994). This Court in United States v. Jacoby, 11 C.M.A. 428, 430-31, 29 C.M.R. 244, 246-47 (1960), stated that “the protections of the Bill of Rights, except for those which are expressly, or by necessary implication inapplicable, are available to members of the armed forces.” One of the most important of these rights is the Fourth Amendment right to privacy:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Investigator Boone’s actions in this case were reasonable and could be justified under the search incident-to-arrest doctrine. Neither Mincey nor Flippo precludes holding that Investigator Boone’s actions were reasonable. Mincey resulted from an undercover drug bust gone awry, which entailed a four-day search to obtain evidence. An undercover police officer, Barry Headricks, had arranged to purchase drugs from the appellant Mincey at Mincey’s house. Mincey ostensibly left the house to obtain money. On his return, he was accompanied by nine other plain clothes policemen and a deputy county attorney. John Hodgman, one of three of Mincey’s housemates, opened the door. Upon seeing the entourage, Hodgman immediately attempted to slam the door, but Headricks slipped inside and moved quickly to the bedroom. The officers were able to push Hodgman back, but a volley of shots rang out, one of them striking Headricks, who was wounded and semiconscious on the floor. Officer Headricks died a few hours later. After the victims were removed from the scene, a four-day search that included *496 opening dresser drawers ensued. Mincey, 437 U.S. at 387-89, 98 S.Ct. 2408.
The Supreme Court rejected the prosecution’s argument that Mincey forfeited any reasonable expectation of privacy or “that the police entry to arrest Mincey was so great an invasion of his privacy that the additional intrusion caused by the search was constitutionally irrelevant.” Id. at 391, 98 S.Ct. 2408. The Court stated that “this claim is hardly tenable in light of the extensive nature of this search.” Id. It is one thing to argue that a person arrested has a lesser expectation of privacy, but “[i]t is quite another to argue that he also has a lesser right of privacy in his entire house____ Indeed, this very argument was rejected when it was advanced to support the warrantless search of a[n] [entire] dwelling where a search occurred as ‘incident’ to the arrest of its occupant.” Id.
The Court also rejected the argument that there was a lawful search “in light of the extensive nature of this search.” Id. “[A] four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of legitimate concerns that justify an emergency search.” Id. at 393, 98 S.Ct. 2408. The actions of the police in Mincey were an over-reaction to the killing of a police officer. The Supreme Court in Mincey did not state at what point during the four days the officers crossed the line. Instead, the Court remanded the case to the state court for a determination as to what evidence was lawfully gathered. Id. at 395 n. 9, 98 S.Ct. 2408
Importantly, the Court in Mincey recognized that the Fourth Amendment does not prohibit warrantless entries if a person is reasonably believed to be in need of aid. Nevertheless, such searches must be “strictly circumscribed by the exigencies which justify its initiation ... and simply cannot be contended that this search was justified by any emergency threatening life or limb.” Id. at 393, 98 S.Ct. 2408 (citation omitted). As in the instant case, and most similar cases, the police often call for back-up to assist any victims, secure the crime scene, and ensure there is no escape by the suspect. Courts have upheld the follow-up entry of additional police officers in this manner under the “continuation doctrine”. See State v. Magnano, 204 Conn. 259, 528 A.2d 760, 764 (1987).
Flippo v. West Virginia is also distinguishable. Flippo and his wife were vacationing in an isolated cabin in a state park. The local authorities received a 911 call from Flippo stating that he and his wife had been attacked by an intruder wielding a log and a knife. When the police arrived on the scene, they found Mrs. Flippo dead and her head covered with blood. After taking Flippo to the hospital, the police returned to the cabin to investigate, where they unlocked a brief case and found photographs that incriminated Flippo. These photographs were admitted at trial to convict Flippo.
Addressing the argument that the photographs were unlawfully seized in violation of Flippo’s Fourth Amendment right to privacy, the Supreme Court remanded the case because the West Virginia Court “simply found that after the homicide crime scene was secured for investigation, a search of ‘anything and everything found within the crime scene area’ was ‘within the law,’ ” and “made no attempt to distinguish Mincey.” Flippo, 528 U.S. at 14-15, 120 S.Ct. 7. On remand, the West Virginia Supreme Court found that because Flippo had consented for the police to return to the premises, the photographs were lawfully seized as evidence. State v. Flippo, 212 W.Va. 560, 575 S.E.2d 170 (2002).
The facts of the instant case establish the reasonableness of Investigator Boone’s actions. Certainly, because the search in this case was a continuation of the initial entry, rather than an entirely new entry, Investigator Boone’s search of the immediate area was appropriate. See, e.g., Magnano, 528 A.2d at 764; People v. Reynolds, 672 P.2d 529, 531 (Colo.1983). The continuation doctrine permits officers who are called to the scene as back-up support to take photographs and gather evidence, while the initial responding officer is still on the premises.
Additionally, the search incident-to-arrest doctrine justifies “the opening of containers found within the physical area covered by the search.” United States v. Hudson, 100 F.3d *497 1409, 1419 (9th Cir.1996). In determining whether the object seized was within the “immediate control” of the defendant, the crucial time “for analysis ... is the time of the arrest and not the time of the search.” In re Sealed Case 96-3167, 153 F.3d 759, 767 (D.C.Cir.1998). In applying this test, the D.C. Circuit court noted it was in accord with “our sister circuits.” Id. at 768 n. 4. To hold otherwise “might create a perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer.” Id. at 768 (quoting United States v. Abdul-Saboor, 85 F.3d 664, 669 (D.C.Cir.1996)).
In sum, unlike Mincey, the search in this case was not a four-day search, but rather a brief search following an arrest which required Investigator Boone’s back-up to control an unruly suspect, aid the ailing victim, protect the crime scene from further disruption, and guarantee the originating officer’s protection. Investigator Boone’s search of the bedroom and bathroom was certainly reasonable under these circumstances, and the manila folder he seized was found within the radius where an officer would reasonably check for evidence or a weapon under the search incident-to-arrest doctrine. For these reasons, I would validate the search and affirm Appellant’s conviction.

 We are not bound by the lack of a Government challenge to the Court of Criminal Appeals opinion. See United States v. Williams, 41 M.J. 134, 135 (C.M.A.1994).