IN THE CASE OF


UNITED STATES, Appellee

v.

Patrick L. SIMMONS, First Lieutenant
U.S. Army, Appellant

No. 03-0369

Crim. App. No. 20000153

United States Court of Appeals for the Armed Forces

Argued January 14, 2004

Decided June 1, 2004

ERDMANN, J., delivered the opinion of the Court, in which GIERKE
and EFFRON, JJ., joined.  BAKER, J., filed a separate opinion
concurring in part and dissenting in part.  CRAWFORD, C.J.,
filed a separate dissenting opinion.

Counsel

For Appellant:  Captain Robert E. Desmond (argued); Colonel
Robert D. Teetsel, Lieutenant Colonel Mark Tellitocci, Major
Allyson G. Lambert, and Captain Gregory M. Kelch (on brief);
Lieutenant Colonel E. Allen Chandler, Jr., Major Imogene M.
Jamison and Captain Mary E. Card.

For Appellee:  Captain Ryan R. McKinstry (argued); Colonel
Lauren B. Leeker, Lieutenant Colonel Margaret B. Baines, and
Major Theresa A. Gallagher (on brief).

Military Judge:  John P. Galligan and Stephen R. Henley


   **This opinion is subject to editorial correction before final publication**.

Judge ERDMANN delivered the opinion of the Court.

First Lieutenant Patrick L. Simmons was tried by a general court-martial composed of officer members and was convicted of assault consummated by a battery and conduct unbecoming an officer and gentleman in violation of Articles 128 and 133, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 928 and 933 (2000), respectively.  The adjudged and approved sentence included dismissal, confinement for nine months, and total forfeiture of all pay and allowances.

Prior to trial, Simmons filed a motion to suppress a handwritten letter discussing a homosexual relationship and a portion of a videotaped interrogation conducted by civilian law enforcement officials concerning the letter.  Simmons argued that the letter had been discovered and seized in violation of his Fourth Amendment rights and that the challenged portions of the videotaped statement were derivative of the illegally seized letter.  The military judge denied the motion to suppress and both the letter and the videotaped statement were admitted into evidence.

The Army Court of Criminal Appeals held that the search leading to the discovery of the letter violated the Fourth Amendment and that the military judge had erred in allowing the admission of the letter and the derivative videotaped statement into evidence.  It determined, however, that the military

2

judge's error was "harmless beyond any reasonable doubt." United States v. Simmons, ARMY 20000153, slip op. at 9 (A. Ct. Crim. App. March 31, 2003).  We granted review of the following issue:

> WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT FOUND THAT APPELLANT'S 4TH AMENDMENT RIGHTS WERE VIOLATED BUT THEN CONCLUDED THAT THE ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT.

We hold that the Court of Criminal Appeals correctly assessed the effect of the improperly admitted evidence with respect to a portion of Simmons' finding of guilt under Article 133, but erred in concluding that the effect of the improperly admitted evidence on the Article 128 assault conviction was harmless beyond a reasonable doubt.

## BACKGROUND

Both convictions flow from Simmons' relationship with an enlisted subordinate in his unit, Private First Class (PFC) W. At some point in early August 1999, Simmons and PFC W entered into an arrangement under which PFC W occupied, at times, one of the two bedrooms in the off-post apartment leased by Simmons in Killeen, Texas.  Although PFC W was not a party to the apartment lease, he kept several sets of clothing there and spent approximately 15 nights at the apartment during August 1999.

On August 29 Simmons and PFC W had an argument.  PFC W subsequently left the apartment but returned later in the

3

afternoon with another soldier to pick up some personal items. Upon his return, PFC W and Simmons engaged in an escalating confrontation that eventually turned physical.

At that point, the soldier who had accompanied PFC W to the apartment contacted the police. Officer Fox of the Killeen Police Department arrived on the scene and asked Simmons what had happened. Simmons advised Officer Fox that there had been a fight but that PFC W had already left the apartment. After the other soldier advised Officer Fox that PFC W had not in fact left the apartment, Simmons consented to Officer Fox's entry into the apartment where he discovered PFC W lying unresponsive on the floor in a pool of blood.

Simmons told Officer Fox that PFC W had barged in and that he [Simmons] "had to kick his ass." Due to the amount of blood and the nature of PFC W's injuries, Officer Fox believed that a weapon had been used and he ordered Simmons to the floor and frisked him for weapons, but found none. After interviewing several witnesses, Officer Fox arrested Simmons for assaulting PFC W and Simmons was transported to the Killeen Police Department for questioning.

Officer Fox conducted two brief searches of the apartment looking for a weapon, but no weapon was found and no evidence was seized as a result of those searches. After Officer Fox had concluded his second search and 20 minutes after Simmons had

been removed from the scene, Investigator Boone of the Killeen Police Department arrived and Officer Fox advised him that he had already searched for a weapon. Investigator Boone spent the next hour to hour and a half taking photographs, examining clothing and conducting his own search of the apartment. After observing a bloodstain on the sink and counter in the guest bathroom, Investigator Boone entered the bathroom and opened a closed medicine cabinet.

Upon opening the cabinet door, Investigator Boone observed a manila file folder with handwritten text on the outside of the folder. Without removing the folder, Investigator Boone read the text. According to Investigator Boone, the text discussed a homosexual relationship and, based on his assessment that the handwriting appeared similar to other visible items in the apartment bearing Simmons' name, Boone seized the letter as evidence of possible motive for the assault. Officer Fox testified that Investigator Boone's comment to him upon finding the letter was something to the effect of "This is going to be good."

The next morning Investigator Boone interrogated Simmons for over an hour concerning the circumstances surrounding the fight with PFC W and videotaped that interrogation. Simmons initially denied anything more than a platonic relationship with PFC W, but when Investigator Boone informed him that he had

seized the handwritten letter, Simmons admitted to a sexual relationship with PFC W.  This admission occurred during the last three minutes of the interrogation.

Simmons sought to suppress both the handwritten letter and his videotaped statement on the grounds that the search by which the letter had been discovered and its subsequent seizure had occurred in violation of his Fourth Amendment rights.  The military judge denied that motion and Simmons ultimately testified in his own defense at trial concerning his relationship with PFC W, including the circumstances surrounding the seized letter and the homosexual nature of their relationship.  Simmons indicated that PFC W had at first blackmailed him regarding his homosexuality, but that they subsequently became friends and that the relationship became sexual.  He further testified to having taken PFC W to his family reunion and to having lent him money that PFC W had failed to repay.

With respect to the assault charge, Simmons raised the defense of self-defense.  He testified that PFC W continuously came at him and that he struck back simply to keep him away. Simmons also testified that PFC W had injured him on prior occasions by punching him, pushing him into a bathtub and cracking a rib, kicking him in the stomach, biting his finger, hitting him in the face, grabbing his testicles and stabbing him

in the back with a knife. Simmons stated that due to these prior beatings, at the time of the fight with PFC W, he was in fear for his life.

The soldier who had accompanied PFC W to the apartment was the only other witness to the fight. He testified that he never saw Simmons strike PFC W and that the only physical act he observed was PFC W having Simmons pinned against a glass window with his forearm against Simmons' throat. The soldier separated the two because of his concern that Simmons could have gone through the window and been severely cut by the glass. According to the soldier, he complied with Simmons' request to leave the apartment at that point and then asked a neighbor to call 911.

PFC W testified under a grant of immunity and, although he denied any homosexual relationship with Simmons, he acknowledged that Simmons had confided his homosexuality to him. He testified that Simmons had taken him to a homosexual club on two separate occasions, had attempted to kiss him twice and had grabbed his buttocks on a few occasions.

In regard to the assault charge, PFC W testified that he had returned to the apartment to retrieve his clothing and effects. He testified, however, that he had no specific recollection of the assault apart from being grabbed from behind, exchanging words with Simmons concerning telephone calls made to PFC W's girlfriend and hitting the ground with blood

7

coming out of his nose and mouth. The injuries PFC W sustained as a result of the assault included a fracture of the bones right below the right eye, a fracture through the thin part of the skull just above and in front of the right ear, and a small amount of bleeding just over the surface of the brain.

The members found Simmons not guilty of the charged assault in which grievous bodily injury is inflicted, but guilty of the lesser-included offense of assault consummated by battery. The members also found him guilty of conduct unbecoming an officer and a gentleman, with the language of the guilty finding modified through exceptions and substitutions as follows:

> [O]n or between 01 September 1998 and 29 August 1999, at or near Camp Dobol, Bosnia and Fort Hood, Texas, wrongfully enter into an unprofessional relationship with [PFC W], a subordinate, to wit: a close personal friendship, a ~~rent-paying roommate~~ regular over-night [sic] guest relationship, an intimate relationship involving sexual contact, and the pursuit of a continued romantic relationship by means of writing and delivering to [PFC W] a letter in which the said 1LT Simmons solicited a continued romantic relationship, in violation of the customs of the United States Army that officers shall not fraternize with enlisted persons on terms of military equality.

## DISCUSSION

### A.  Introduction

The Government has not certified any challenge to the Court of Criminal Appeals' determination that the evidence at issue here was the product of a search and seizure that violated Simmons' rights under the Fourth Amendment. See Article

8

67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2) (2000). Although we are not precluded from examining the legal ruling of a service court in a case where the Judge Advocate General has not certified the issue for review, we are reluctant to exercise that power and, as a rule, reserve it only for those cases where the lower court's decision is "clearly erroneous and would work a manifest injustice" if the parties were bound by it. United States v. Doss, 57 M.J. 182, 185 (C.A.A.F. 2002)(citing Christian v. Colt Industries Operating Corp., 486 U.S. 800, 817 (1998)). That is not the case here.

We therefore turn to the question presented by the granted issue, which is whether the Army Court of Criminal Appeals properly assessed the impact of the military judge's erroneous denial of Simmons' motion to suppress certain evidence.

B.   Standard of Review

The Court of Criminal Appeals properly identified the applicable legal standard. After finding that the military judge erroneously admitted into evidence material that the Government had obtained in violation of Simmons' rights under the Fourth Amendment, that error was subject to a "harmless error" review under Chapman v. California, 386 U.S. 18, 24 (1967). Under Chapman, a reviewing court must declare the impact of the error to be "harmless beyond a reasonable doubt"

9

in order to affirm the resultant conviction.  See e.g., United States v. Hall, 58 M.J. 90, 94 (C.A.A.F. 2003).

The Government bears the burden of establishing that any constitutional error is harmless beyond a reasonable doubt.  Id. (citing Chapman, 386 U.S. at 24).  Whether the error is harmless beyond a reasonable doubt is a question of law that we review de novo.  Id. (citing Arizona v. Fulminante, 499 U.S. 279, 295-96 (1991)).

The question before this Court, therefore, is whether the effect of the improperly admitted evidence on Simmons' convictions was harmless beyond a reasonable doubt.  The inquiry under the Chapman analysis is whether "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict[s] obtained.'"  Mitchell v. Esparza, ___ U.S. ___, ___, 124 S.Ct. 7, 11 (2003)(per curiam)(quoting Neder v. United States, 527 U.S. 1, 15 (1999)).  See also Hall, 58 M.J. at 94.

C.   The Article 133 Conviction

The finding of guilt in regard to the Article 133 conviction reflects a determination by the members that Simmons engaged in the following with PFC W:

- a close personal friendship;

- a regular overnight guest relationship;

- an intimate relationship involving sexual
  contact; and

- the pursuit of a continued romantic relationship
  by means of writing and delivering to PFC W a
  letter in which Appellant solicited a continued
  romantic relationship.

In regard to the "pursuit of a continued romantic relationship" portion of the finding, in order for us to deem the erroneous admission of the illegally seized letter "harmless beyond a reasonable doubt," we would have to conclude that it "did not contribute to" a guilty finding that makes specific reference to the letter itself. Neder, 527 U.S. at 15. That we cannot do. The very act of "writing and delivering" that letter was an explicit part of the criminal conduct that Simmons was charged with and found guilty of. Absent the erroneous admission of the letter into evidence, the members could not have found him guilty of "writing and delivering" it.

We also cannot conclude, beyond a reasonable doubt, that the admission of the letter and the derivative videotaped statement by Simmons concerning the sexual nature of his relationship with PFC W "did not contribute to" that portion of the guilty finding regarding "an intimate relationship involving sexual contact." The letter indicates that "sex w/ [PFC W] was incredible" and that Simmons knows he will never have sex with

PFC W "until [PFC W] is ready again or never." The videotaped statement contains Simmons' acknowledgement that he and PFC W had sexual relations.

As the Court of Criminal Appeals noted, however, PFC W denied having any sexual relationship with Simmons. Thus, the only evidence in that regard apart from the improperly admitted letter and derivative videotaped statement was Simmons' trial testimony. Although there was testimony from other witnesses concerning the friendship between Simmons and PFC W in Bosnia and at Fort Hood, none of that testimony was directed toward establishing a sexual relationship.

Under the circumstances of this case, we are not convinced that the defense strategy of having Simmons testify at trial concerning the sexual nature of the relationship would have been the same in the absence of the improperly admitted evidence. See e.g., United States v. Grooters, 39 M.J. 269, 273 (C.A.A.F. 1994) (accused may not have been compelled to testify to explain improperly admitted statements); United States v. Bearchild, 17 C.M.A. 598, 602, 38 C.M.R. 396, 400 (1968)(in-court testimony tainted if given to overcome inadmissible confession). Although we need not determine whether their improper admission was the exclusive motivation, Simmons' trial testimony on this aspect of the charged offense was clearly responsive to the letter and derivative videotaped statement. In the absence of those items

12

of evidence (which should not have been admitted) or supporting testimony from PFC W (which did not exist), the record does not reflect any other evidence available to demonstrate the existence of "an intimate relationship involving sexual contact." Under those circumstances, we cannot view Simmons' trial testimony as an "independent" basis for concluding that the improperly admitted evidence "did not contribute to" that portion of the finding regarding sexual contact.

We can conclude, however, that the admission of the improper evidence did not contribute to the remaining portions of the finding, that Simmons engaged in "a close personal friendship" and "regular over-night [sic] guest" relationship with PFC W. As noted by the Court of Criminal Appeals, there was testimony and evidence unrelated to the improperly admitted letter and derivative statement that demonstrated the unprofessional character of Simmons' relationship with PFC W:

> In addition to PFC W's testimony, a staff sergeant in appellant's platoon testified that the noncommissioned officers expressed concerns about appellant's relationship with PFC W; that he saw PFC W driving appellant's car; and that personnel commented that if someone wanted to find appellant when in the field, he or she would likely find him at PFC W's medic track. Appellant's platoon sergeant also testified that appellant spent a lot of time at the medic track; that PFC W and appellant called each other by their first names; that appellant pulled PFC W off of guard duty when they were deployed to Bosnia. A neighbor in the apartment complex testified that PFC W lived in appellant's apartment. Private First Class W's fiancée testified that PFC W lived with "Patrick," the appellant. A written statement given by appellant to [Investigator] Boone, in which appellant accounts for the events on the day the

13

assault occurred, was admitted into evidence without objection. Appellant referred to PFC W by his first name throughout the statement; stated that PFC W had stayed overnight in his apartment the prior evening; mentioned that he cancelled a visit that he and PFC W had planned to appellant's sister-in-law; and drank beer together while watching football games.

Simmons, slip op. at 7-8. The quantum and character of the evidence specifically referred to by the Court of Criminal Appeals above is not related to or otherwise a product of the illegally seized letter or the derivative videotaped statement. Moreover, Simmons did not seriously contest the friendship and roommate aspects of the charge. In light of those circumstances, we conclude beyond a reasonable doubt that the constitutional error did not contribute to that portion of the guilty finding that refers to "engaging in a close personal friendship" and a "regular over-night [sic] guest" relationship with PFC W. See Neder, 527 U.S. at 15.

Accordingly, while we conclude that the military judge's error was not harmless beyond a reasonable doubt with respect to the members' guilty finding of conduct unbecoming an officer and a gentleman in regard to the sexual contact and the improperly admitted letter, we conclude that the military judge's error was harmless beyond a reasonable doubt with respect to that portion of the members' guilty finding that Simmons violated Article 133 by engaging in "a close personal friendship" and "regular over-night [sic] guest" relationship with PFC W.

14

D.   The Article 128 Conviction

The Court of Criminal Appeals focused exclusively on Simmons' conviction under Article 133 and did not assess the impact of the erroneously admitted evidence on Simmons' conviction for assault consummated by a battery.  While they are distinct criminal offenses our inquiry remains the same -- can the Government demonstrate beyond a reasonable doubt that the admission of the illegally seized letter and the derivative videotaped statement did not contribute to the finding of guilt under the assault charge?  See Neder, 527 U.S. at 15.

The Government has not met its burden here.  Under the Government's theory of the case, the assault was the direct product of Simmons' alleged unrequited homosexual "obsession" with PFC W.  In fact, trial counsel referred to the illegally seized letter in the beginning, middle and end of his closing argument.  The illegally seized letter and derivative videotaped statement were the obvious centerpieces of the Government's theory and, as discussed above, were the only evidence apart from Simmons' derivative trial testimony that concerned a homosexual relationship.  Simmons, on the other hand, vigorously contested that theory of the assault and raised evidence under a self-defense theory.  PFC W testified to only a limited recollection of the events surrounding the fight.  The only

15

other witness testified that he saw PFC W pinning Simmons to a window with his arm to his throat.

Under those circumstances, the Government has not met its burden of demonstrating that the error was harmless beyond a reasonable doubt under the Chapman analysis.  We cannot say that the improper admission of the evidence at issue here and the "gay obsession" theory that it was offered in support of did not contribute to the finding of guilty under the assault charge.  See Neder, 527 U.S. at 15.

                         CONCLUSION

The decision of the United States Army Court of Criminal Appeals is reversed.  The finding of guilty of Charge II, its specification and the sentence are set aside.  That portion of the specification under Charge I referring to "an intimate relationship involving sexual contact" and "the pursuit of a continued romantic relationship by means of writing and delivering to [PFC W] a letter in which the said 1LT Simmons solicited a continued romantic relationship" is set aside, but Charge I and the balance of its specification is affirmed.  The case is returned to the Judge Advocate General of the Army.  A rehearing on Charge II and the sentence may be ordered.  If a rehearing as to Charge II is deemed impracticable, the dismissal of Charge II and a rehearing as to sentence alone may be ordered.

United States v. Simmons, No. 03-0369/AR

BAKER, Judge (concurring in part and dissenting in part):

I concur in the majority's treatment of Appellant's conviction under Article 133, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 933 (2000). However, for the reasons stated below, I respectfully dissent from the majority's analysis regarding Appellant's conviction under Article 128, UCMJ, 10 U.S.C. § 928 (2000).

As the majority recounts, the Court of Criminal Appeals determined that the search of Appellant's apartment, resulting in the discovery of his letter to Private First Class (PFC) W, violated Appellant's Fourth Amendment rights. As a result, the letter should have been suppressed at trial. Since this was a constitutional error, the question before this Court is whether the admission of the letter was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967); United States v. Hall, 58 M.J. 90, 94 (C.A.A.F. 2003). The Government bears the burden of demonstrating that a constitutional error is harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24; Hall, 58 M.J. at 94. On these two points the case law is consistent and clear. Thus, in Chapman the Supreme Court stated, "The beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of did not

1

contribute to the verdict obtained."[1]  Chapman, 386 U.S. at 24.
In ruling for the appellant in that case, the Supreme Court also
considered the strength of the Government's case absent the
constitutional error.  The Court concluded that "though the case
in which this occurred presented a reasonably strong
'circumstantial web of evidence' against petitioners, it was
also a case in which, absent the constitutionally forbidden
comments, honest, fair-minded jurors might very well have
brought in not-guilty verdicts."  Id. at 25-26 (citation
omitted).  See also Harrington v. California, 395 U.S. 250, 254
(1969)("Our judgment must be based on our own reading of the
record and on what seems to us to have been the probable impact
of the two confessions on the minds of an average jury.").

Subsequent to Chapman, the Supreme Court and our Court have
emphasized different facets of the Chapman analysis.  In Arizona
v. Fulminante, the Supreme Court said, "The Court has the power
to review the record de novo in order to determine an error's

---

[1] The Supreme Court stated, "We prefer the approach of this Court
in deciding what was harmless error in our recent case of Fahy
v. Connecticut, 375 U.S. 85 [(1963)].  There we said:  'The
question is whether there is a reasonable possibility that the
evidence complained of might have contributed to the
conviction.'"  Chapman v. California, 386 U.S. 18, 23
(1967)(citation omitted).  The Court went on to state that
"[t]here is little, if any, difference" between the Fahy test
and the Chapman test "that the error complained of did not
contribute to the verdict obtained."  Id. at 24.  Of course, the
Chapman formulation omits the qualifications "reasonable
possibility" and "might have" that are found within the Fahy
test.  See id. at 23-24; Fahy, 375 U.S. at 86-87.

harmlessness.  In so doing, it must be determined whether the State has met its burden of demonstrating that the admission of the [coerced] confession . . . did not contribute to Fulminante's conviction."  499 U.S. 279, 295-96 (1991)(citations omitted)(emphasis added).  We adopted the same point of emphasis in United States v. Grooters, 39 M.J. 269 (C.M.A. 1994).  In weighing the strength of the Government's case against the taint of constitutional error, we stated, "The Government . . . must exclude the 'reasonable possibility that the evidence complained of might have contributed to the conviction.'"  Id. at 273 (quoting Fahy, 375 U.S. at 86-87)(emphasis added).

However, in Neder v. United States, 527 U.S. 1 (1999) the Supreme Court focused not only on the contribution of the tainted evidence, but also on the strength of the Government's case and therefore the impact of the tainted evidence:  "We think, therefore, that the harmless-error inquiry must be . . . :  Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"  Id. at 18.  In Hall, we did the same, noting that the focus of the Chapman inquiry is "on whether the error had or reasonably may have had an effect upon the members' findings."[2]  Hall, 58 M.J.

---

[2] In Sullivan v. Louisiana, 508 U.S. 275 (1993), the Supreme Court applied a per se rule of prejudice where the jury was provided an unconstitutional reasonable doubt instruction. There the Court determined that application of the Chapman

3

at 94 (emphasis added)(quoting United States v. Bins, 43 M.J. 79, 86 (C.A.A.F. 1995)). See also United States v. Grijalva, 55 M.J. 223, 228 (C.A.A.F. 2001)(admission of tainted evidence harmless beyond a reasonable doubt because it "was not a significant factor in the determination whether appellant was guilty of the greater or lesser offense" and powerful and uncontested evidence of guilt was otherwise presented.)

The difference in focus between these cases is important, if not determinative, as to how harmless error analysis applies in Appellant's case. Appellant's letter was integral to the Government's theory of the case. Appellant argued self-defense and the Government countered by using the letter to suggest that Appellant had a motive to beat PFC W, notwithstanding his claim of self-defense. Thus, if one focuses on whether the letter "contributed" to Appellant's conviction, it would be impossible to conclude otherwise.

Such contribution is incalculable. In theory, all evidence presented at trial "contributes" in some manner to a panel's consideration of the case, including where it is discounted, but nonetheless informs a panel's decision to give greater weight to other evidence. Thus, I have no doubt that the presentation of

harmless error review was illogical where the jury's verdict was itself a nullity. 508 U.S. at 280. "The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, . . . ; it requires an actual jury finding of guilty." Id.

Appellant's letter by the Government contributed to the verdict in this case.  Portions of the letter were read aloud to the panel during Appellant's testimony.  The panel read the letter.  There is, therefore, no way of knowing beyond a reasonable doubt that it did not "contribute" in some manner to their verdict.

In my view, however, Chapman and Neder require appellate courts to focus on the impact of the tainted evidence on the verdict as the measure of the tainted evidence's potential "contribution."[3]  See Chapman, 386 U.S. at 24; Neder, 527 U.S. at 18.  Otherwise, there would be no need for harmless error analysis since we would never be able to disaggregate the relative contribution of one piece of evidence over another without polling the members and opening jury deliberations to appellate inspection.  This was the view of Justice Harlan's dissent in Chapman.  See 386 U.S. at 55.  The Supreme Court, however, could not have intended this result or it would not have upheld the Chapman line of harmless error cases.

The Neder-Hall impact test leads to a review of other evidence in this case and, in my view, a different conclusion than that reached by the majority.  See Neder, 527 U.S. at 18; Hall, 58 M.J. at 94.  Appellant's self-defense argument rested

---

[3] The constitutional error in this case was not of the nature suggested in Sullivan where the error went to the underlying validity of the court-martial itself.  In that situation, a harmless error analysis is illogical and should be precluded. See 508 U.S. at 280.

5

upon the nature of his prior altercations with PFC W, the fact

that Specialist (SPC) Dewit, the friend who accompanied PFC W to

the apartment, had seen Appellant pinned against the window by

PFC W's forearm, and the potential that PFC W could have

fractured his skull by hitting his head on a wooden bar in the

back of the bedroom, as opposed to as a direct result of

Appellant's blows.  Nevertheless, the evidence against Appellant

of assault consummated by a battery was significant and

substantial.  This is not a case like Grooters where the only

evidence was derivative of the tainted evidence.  39 M.J. at

273.

- First, SPC Dewit, intervened to break up the fight
  between Appellant and PFC W at the point where PFC W
  had Appellant pinned against the window with his
  forearm.  Thus, at this point, Appellant had the
  opportunity to walk away from any threat he may have
  felt from PFC W.  SPC Dewit also indicated that
  tempers did not seem to be exceedingly flared so it
  was easy for him to break up the fight.

- Second, PFC W's medical injuries were extensive.
  Doctors and police testified they had never seen
  anyone beaten this badly without the use of a weapon.
  Moreover, the injuries were a product of repeated

blows, not a singular traumatic strike. In contrast, Appellant's injuries consisted of one broken knuckle.

- Third, Appellant told the police that the individual he had the fight with had already left the apartment. Officer Fox testified that Appellant told his mother over the phone, PFC W "came in and started some shit, and I beat his ass down bad." Appellant also testified that he "may" have hit PFC W while PFC W was on the ground.

After weighing the strength of the Government's case against the potential contribution of the tainted evidence, I am convinced beyond a reasonable doubt that a rational panel would have found Appellant guilty of assault consummated by battery absent the error. See Neder, 527 U.S. at 18. Therefore, I respectfully dissent in part.

7

United States v. Simmons, No. 03-0369/AR

CRAWFORD, Chief Judge (dissenting):

The majority ignores[*] the "touchstone of the Fourth Amendment" -- the reasonableness of police action at the scene of the crime. See, e.g., Florida v. Jimeno, 500 U.S. 248, 251 (1991). The majority also gives short shrift to several salient facts, including: Appellant lied to the police regarding what transpired in his apartment, and then became very agitated as the police were trying to control the crime scene, aid the victim, ensure their own safety, and gather evidence. The actions of the responding police officer and his back-up under these circumstances were more than reasonable.

The Fourth Amendment has two clauses: reasonableness and probable cause. Most importantly, the Fourth Amendment requires all government searches and seizures to be reasonable. The search in this case satisfied that requirement and is not precluded by Mincey v. Arizona, 437 U.S. 385 (1978), or Flippo v. West Virginia, 528 U.S. 11 (1999). In addition to the search being reasonable, it also may be justified as incident to the lawful arrest of Appellant. Accordingly, I respectfully dissent from the lead opinion.

---

[*] We are not bound by the lack of a Government challenge to the Court of Criminal Appeals opinion. See United States v. Williams, 41 M.J. 134, 135 (C.M.A. 1994).

FACTS

It is important to highlight additional facts of this case to understand the reasonableness of the police officer's action.

On August 29, 1999, at 6:25 p.m., a Kileen, Texas, Police Officer, Eric Fox, arrived at Appellant's apartment in response to a report of a fight. When Officer Fox arrived, he approached Specialist (SPC) Dewit, who said that he had accompanied PFC W, the assault victim, to the apartment to remove PFC W's personal belongings. Officer Fox then approached the apartment and talked to Appellant. Appellant said there had been a fight, but that the friend with whom he fought had departed. SPC Dewit, by contrast, told the officer no one had left the scene.

Officer Fox then asked to enter the apartment. Appellant was initially reluctant, but eventually allowed him to enter the apartment to see if anyone was injured after the fight. Officer Fox made a visual sweep of the apartment and found PFC W unconscious lying in a pool of blood on the floor in the guest bedroom next to the bathroom door. At first, Appellant complied with Officer Fox's order to stay on his knees, but then became agitated and stood up. Officer Fox asked what had happened. Officer Fox stated that Appellant "proclaimed that [PFC W] had barged in and he had to kick his ass." Appellant then "got up off the ground . . . then again ordered him to the ground, and there was a small scuffle. [Officer Fox] did have to place him

2

in [hand]cuffs." Appellant continued to insist that PFC W had barged in, but Officer Fox challenged this assertion by noting that there was no damage to the front door. A very agitated Appellant still insisted that PFC W had barged in. Officer Fox again ordered him to the floor. "Due to his size and me still trying to watch the victim, [Officer Fox] pull[ed] out [his] pepper spray and advised that [he] would have to spray him. He did calm down again, but then escalated his behavior again." Appellant was ordered to his knees a number of times, causing Officer Fox to pull out the pepper spray. Because of Appellant's reactions, Officer Fox quickly ordered back-up and an ambulance, and handcuffed Appellant.

Within five minutes of the backup request, additional officers arrived, took control of Appellant, and secured the apartment. Within 15 or 20 minutes after the officers had secured the crime scene and left, Investigator Patrick Boone arrived. Even though the other officers had left and Investigator Boone had arrived, the police did not know who else might be involved and Appellant was not cooperative. Accordingly, Investigator Boone conducted a search of the bedroom and bathroom for a weapon. While looking for weapons, he opened the medicine cabinet, which is about three feet from where the victim had been before he was moved, and noticed a manila folder with writing on the outside, admitted at trial as

Prosecution Exhibit 6. Investigator Boone described the folder as being "immediately visible" and "in plain view." "Without removing the [folder] from the cabinet, Investigator Boone began reading the front side; the handwriting appeared similar to other visible items in the apartment bearing the accused's name." Investigator Boone, who had prior military service, thought it "strange that a private would be sharing an apartment with an officer." After reading the note, "[Investigator] Boone concluded the letter provided a motive for the accused to assault [PFC W] and seized it as evidence." Investigator Boone stayed at the crime scene for approximately an hour and a half, to take crime scene photographs, including photographs of the blood splatters and blood swipes.

The next morning, Investigator Boone interrogated Appellant, who described the circumstances surrounding the fight. Appellant, a platoon leader, denied anything more than a platonic friendship with PFC W. Investigator Boone then asked him about the handwritten note, and Appellant admitted to a sexual relationship with PFC W. After the judge denied the motion to suppress the note, Appellant entered a guilty plea to fraternization by exceptions and substitution in the lesser included offense of assault by inflicting grievous bodily harm.

In denying the motion to suppress, the judge said: "Under the circumstances of this case, I find the accused forfeited any

reasonable expectation of privacy he may have had in the letter when he surrendered it to [PFC W]. . . ." The judge held that the seizure of the letter "from the medicine cabinet was incident to the accused's lawful arrest." The search was "substantially contemporaneous with the accused's arrest and especially limited to the area within the accused's immediate control."

### DISCUSSION

The Bill of Rights grants American citizens extensive rights. Courts and commentators have long debated the application of these rights to servicemembers. See, e.g., United States v. Lopez, 35 M.J. 35, 41 n.2 (C.M.A. 1992); Fredric I. Lederer & Frederic L. Borch, Does the Fourth Amendment Apply to the Armed Forces?, 3 Wm. & Mary Bill Rts J. 219 (1994), reprinted and expanded in 144 Mil. L. Rev. 110 (1994). This Court in United States v. Jacoby, 11 C.M.A. 428, 430-31, 29 C.M.R. 244, 246-47 (1960), stated that "the protections of the Bill of Rights, except for those which are expressly, or by necessary implication inapplicable, are available to members of the armed forces." One of the most important of these rights is the Fourth Amendment right to privacy:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no

5

> Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Investigator Boone's actions in this case were reasonable and could be justified under the search incident-to-arrest doctrine. Neither Mincey nor Flippo precludes holding that Investigator Boone's actions were reasonable. Mincey resulted from an undercover drug bust gone awry, which entailed a four-day search to obtain evidence. An undercover police officer, Barry Headricks, had arranged to purchase drugs from the appellant Mincey at Mincey's house. Mincey ostensibly left the house to obtain money. On his return, he was accompanied by nine other plain clothes policemen and a deputy county attorney. John Hodgman, one of three of Mincey's housemates, opened the door. Upon seeing the entourage, Hodgman immediately attempted to slam the door, but Headricks slipped inside and moved quickly to the bedroom. The officers were able to push Hodgman back, but a volley of shots rang out, one of them striking Headricks, who was wounded and semiconscious on the floor. Officer Headricks died a few hours later. After the victims were removed from the scene, a four-day search that included opening dresser drawers ensued. Mincey, 437 U.S. at 387-89.

The Supreme Court rejected the prosecution's argument that Mincey forfeited any reasonable expectation of privacy or "that

the police entry to arrest Mincey was so great an invasion of his privacy that the additional intrusion caused by the search was constitutionally irrelevant." Id. at 391. The Court stated that "this claim is hardly tenable in light of the extensive nature of this search." Id. It is one thing to argue that a person arrested has a lesser expectation of privacy, but "[i]t is quite another to argue that he also has a lesser right of privacy in his entire house. . . . Indeed, this very argument was rejected when it was advanced to support the warrantless search of a[n] [entire] dwelling where a search occurred as 'incident' to the arrest of its occupant." Id.

The Court also rejected the argument that there was a lawful search "in light of the extensive nature of this search." Id. "[A] four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of legitimate concerns that justify an emergency search." Id. at 393. The actions of the police in Mincey were an over-reaction to the killing of a police officer. The Supreme Court in Mincey did not state at what point during the four days the officers crossed the line. Instead, the Court remanded the case to the state court for a determination as to what evidence was lawfully gathered. Id. at 395 n.9

Importantly, the Court in Mincey recognized that the Fourth Amendment does not prohibit warrantless entries if a person is

7

reasonably believed to be in need of aid.  Nevertheless, such searches must be "strictly circumscribed by the exigencies which justify its initiation . . . and simply cannot be contended that this search was justified by any emergency threatening life or limb."  Id. at 393 (citation omitted).  As in the instant case, and most similar cases, the police often call for back-up to assist any victims, secure the crime scene, and ensure there is no escape by the suspect.  Courts have upheld the follow-up entry of additional police officers in this manner under the "continuation doctrine".  See State v. Magnano, 528 A.2d 760, 764 (Conn. 1987).

Flippo v. West Virginia is also distinguishable.  Flippo and his wife were vacationing in an isolated cabin in a state park.  The local authorities received a 911 call from Flippo stating that he and his wife had been attacked by an intruder wielding a log and a knife.  When the police arrived on the scene, they found Mrs. Flippo dead and her head covered with blood.  After taking Flippo to the hospital, the police returned to the cabin to investigate, where they unlocked a brief case and found photographs that incriminated Flippo.  These photographs were admitted at trial to convict Flippo.

Addressing the argument that the photographs were unlawfully seized in violation of Flippo's Fourth Amendment right to privacy, the Supreme Court remanded the case because

the West Virginia Court "simply found that after the homicide crime scene was secured for investigation, a search of 'anything and everything found within the crime scene area' was 'within the law,'" and "made no attempt to distinguish Mincey." Flippo, 528 U.S. at 14-15. On remand, the West Virginia Supreme Court found that because Flippo had consented for the police to return to the premises, the photographs were lawfully seized as evidence. State v. Flippo, 575 S.E.2d 170 (W. Va. 2002).

The facts of the instant case establish the reasonableness of Investigator Boone's actions. Certainly, because the search in this case was a continuation of the initial entry, rather than an entirely new entry, Investigator Boone's search of the immediate area was appropriate. See, e.g., Magnano, 528 A.2d at 764; People v. Reynolds, 672 P.2d 529, 531 (Colo. 1983). The continuation doctrine permits officers who are called to the scene as back-up support to take photographs and gather evidence, while the initial responding officer is still on the premises.

Additionally, the search incident-to-arrest doctrine justifies "the opening of containers found within the physical area covered by the search." United States v. Hudson, 100 F.3d 1409, 1419 (9th Cir. 1996). In determining whether the object seized was within the "immediate control" of the defendant, the crucial time "for analysis . . . is the time of the arrest and

not the time of the search." In re Sealed Case 96-3167, 153 F.3d 759, 767 (D.C. Cir. 1998). In applying this test, the D.C. Circuit court noted it was in accord with "our sister circuits." Id. at 768 n.4. To hold otherwise "might create a perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer." Id. at 768 (quoting United States v. Abdul-Sabor, 85 F.3d 664, 669 (D.C. Cir. 1996)).

In sum, unlike Mincey, the search in this case was not a four-day search, but rather a brief search following an arrest which required Investigator Boone's back-up to control an unruly suspect, aid the ailing victim, protect the crime scene from further disruption, and guarantee the originating officer's protection. Investigator Boone's search of the bedroom and bathroom was certainly reasonable under these circumstances, and the manila folder he seized was found within the radius where an officer would reasonably check for evidence or a weapon under the search incident-to-arrest doctrine. For these reasons, I would validate the search and affirm Appellant's conviction.